UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON
CIVIL ACTION NO._____

BILLY GAVIN FUGATE

and

MARTHA SIZEMORE                                                PLAINTIFFS

**COMPLAINT**
**and**
v.                          **DEMAND FOR TRIAL BY JURY**

CITY OF HAZARD
dba HAZARD POLICE DEPARTMENT

     Serve: Donald "Happy" Mobelini
        700 Main Street
        Hazard, KY 41701

and

DARREN WILLIAMS
in his official and individual capacity

and

TYLER PIGMAN                                                DEFENDANTS
in his official capacity
_____

     The Plaintiffs, Billy Gavin Fugate and Martha Sizemore, for their Complaint herein, state

as follows:

## PARTIES

1.  Plaintiff, Billy Gavin Fugate ("Fugate"), at all relevant times herein, was and is a resident of Hazard, Perry County, Kentucky.

2.  Plaintiff, Martha Sizemore ("Sizemore"), at all relevant times herein, was and is a resident of Hazard, Perry County, Kentucky.

3.  Defendant, City of Hazard, Kentucky ("Hazard"), is a "home rule" city and municipal government entity located in Perry County, Kentucky, and is a political subdivision of the Commonwealth of Kentucky.

4.  Hazard operates the Hazard Police Department ("HPD").

5.  Defendant, Darren Williams ("Williams"), was at all times relevant hereto, the Chief of Police of HPD.

6.  Defendant, Tyler Pigman ("Pigman"), was at all times relevant hereto, a police officer employed by HPD and Hazard.

7.  At all times material hereto, Williams was acting in his capacity as the Chief of Police of HPD under the color of law.

8.  At all times material hereto Pigman was acting in his capacity as a police officer of HPD under the color of law.


## JURISDICTION AND VENUE

9.  Plaintiffs are authorized to bring the claims in this action by 42 U.S.C. § 1983, Kentucky law, and the general legal and equitable powers of this Court.

10. This Court has original jurisdiction over the claims in this action authorized under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

11.     This court has supplemental jurisdiction over the state law claims in this action pursuant to 28 USCS § 1367.

12.     On information and belief, all parties to this action reside within the Eastern District of Kentucky. A substantial portion of the events or omissions giving rise to the claims herein occurred in Perry County, which is assigned to the Southern Jury Division, London Docket.

13.     Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

### STATEMENT OF FACTS

14.     On or about March 30, 2024, in Hazard, Perry County, Kentucky, Sizemore witnessed Williams' participation in the arrest of Fugate, Sizemore's boyfriend, at the time of the events described herein.

15.     On or about March 30, 2024, Kevin Spurlock ("Spurlock") made a call for assistance to HPD requesting the presence of an officer at Bailey's Tire Services in Hazard, Kentucky ("Bailey's").

16.     At the time the call for assistance was made, Sizemore, Fugate, and Fugate's family were at their residence located at on Main Street in Hazard, Kentucky (the "Fugate Residence").

17.     At the time the call for service was made, Spurlock was actually parked at a separate building located next to the Fugate Residence, but Spurlock was not parked at the Fugate Residence or at Bailey's.

18.     Williams was the first officer to respond to the call for assistance made by Spurlock.

19. When Williams responded to the call for assistance made by Spurlock, he was dressed in street clothes and not wearing any clothing or other indicia that readily identified himself as an HPD officer, and was driving a vehicle that was not marked in such a way as to make it readily identifiable as a law enforcement vehicle.

20. Williams arrived at the location where Spurlock was parked, and not at Bailey's or the Fugate Residence, and immediately approached Spurlock's vehicle. Williams spoke with Spurlock for approximately 10 minutes after his arrival.

21. After speaking with Spurlock, Williams approached the Fugate Residence, where Fugate, Fugate's father and brother ("Fugate's family"), were seated on a couch outside on the front porch of the Fugate Residence.

22. Williams' demeanor was hostile from the start of his interaction with Fugate and Fugate's family.

23. Fugate requested to see Williams' badge as Williams was in plain street clothes.

24. Fugate's father requested that Williams hold the badge closer because his eyesight was poor. Williams thrust his badge inches from Fugate's father's face and asked, "can you see it now?"

25. Williams began to question Fugate and Fugate's family about the incident reported by Spurlock as other officers began to arrive on scene.

26. Sizemore was standing in the doorway to the Fugate Residence when Williams began to question Fugate and Fugate's Family.

27. While Williams was questioning Fugate and Fugate's family, multiple other uniformed officers began to arrive at the Fugate Residence, but did not immediately come to where Williams, Fugate, and Fugate's family were interacting.

28.    Williams' questioning continued to be hostile and belligerent. Before the uniformed officers had approached the front porch of the Fugate Residence (where Williams was talking with Fugate and Fugate's family), Fugate informed Williams that he would not be answering any more questions from him and stated that he was going to speak with one of the uniformed officers, due to Williams' hostile demeanor. Fugate had to this point remained seated, along with his family.

29.    As Fugate began to rise from his seat to go talk to the uniformed officers, Williams grabbed Fugate by the throat and forced Fugate back onto the couch, without any justification for the application of that level of force.

30.    Williams continued to use excessive force against Fugate while leveling threats of additional violence against Fugate.

31.    As the other officers on scene approached the front porch of the Fugate Residence, Pigman began—and Williams continued—to excessive force, without justification, against Fugate and the members of Fugate's family seated on the couch with Fugate while leveling threats of additional violence against Fugate.

32.    Because of the excessive force and unjustified threats of violence used by Williams and Pigman directed at Fugate and other members of Fugate's family, Sizemore became concerned for the safety of Fugate, herself, and Fugate's family, and began recording video of the incident with her cellular phone.

33.    Sizemore pleaded with the officers stating that "He [Fugate] didn't do nothing at all!"

34.    Soon after Sizemore began recording, Pigman drew his service taser and took aim at Fugate's face in the presence of the other officers and his supervisor, Williams.

35. The following is a still frame from the video that Sizemore captured, which depicts Williams using force against Fugate and others, while Pigman pointed his taser at Fugate's face (a minor family member's face is blurred):



36.    Pigman's action of drawing and aiming his service taser at Fugate's face was an unjustified and excessive use of force as Fugate was offering no resistance.

37.    Pigman's action of drawing and aiming his service taser at Fugate's face is contrary to the written policies and procedures of HPD.

38.    While he had his service taser pointed at Fugate's face, Pigman shouted orders and made threats to Fugate and yelled "is that fucking understood?! Is that goddamn fucking understood?!"

39.    Pigman's use of profanity against Fugate violated the written policies and procedures of HPD.

40.    Fugate was pulled up from his seated position without resisting while Pigman continued aiming his service taser at Fugate.

41.    Once Fugate was standing, Pigman began to yell to Fugate "put your fucking hands behind your…"

42.    At this point, Williams turned toward Sizemore, and for the first time saw Sizemore's phone and realized Sizemore was recording the incident.

43.    Williams was aware that the force used by himself and the other officers had been excessive and without justification.

44.    Williams was aware that the force used by himself and the other officers had been contrary to the written policies and procedures of HPD.

45.    Williams was aware that Pigman's use of profanity directed toward Fugate violated HPD's written policies and procedures.

46.    Wiliams seized Sizemore's cellphone from her without consent, warning, or justification to do so.

47. Sizemore then stated, "you [Williams] just grabbed my phone out of my hand!"

48. Williams immediately answered Sizemore and declared "sure did," admitting to his seizure of Sizemore's phone.

49. In their interaction with Fugate and Sizemore, Williams and Pigman did not act the way that police officers are supposed to act.

50. The conduct of Williams and Pigman captured on video by Sizemore was unbecoming of Williams and Pigman and HPD.

51. The conduct of Williams and Pigman captured on video by Sizemore was unlawful.

52. Williams did not want Sizemore to record his and Pigman's unbecoming and unlawful conduct.

53. Neither Williams nor Pigman were reprimanded in any way by Hazard or any of their supervisors for their conduct on March 30, 2024.

**Count I - 42 U.S.C. § 1983**
**Violation of Fourth Amendment (Excessive Use of Force):**
**(Claim by Fugate against Williams)**

54. Prior to any physical contact between Williams and Fugate, Fugate was only being detained.

55. Prior to any physical contact between Williams and Fugate, Fugate was not under arrest.

56. Prior to any physical contact between Williams and Fugate, Fugate was non-violent and non-resisting.

57. Fugate was not under arrest before Fugate attempted to move from his seated position.

58. Fugate's attempt to get up from his seated position for the expressed purpose of speaking with another officer due to Williams' hostile demeanor was not an action that constituted resisting arrest.

59. Fugate's attempt to get up from his seated position for the expressed purpose of speaking with another officer due to Williams' hostile demeanor was not an action that constituted an immediate threat to Williams.

60. Williams' actions in forcing Fugate back into his seated position by grabbing Fugate by the throat was not an objectively reasonable use of force.

61. Williams' actions in forcing Fugate back into his seated position by grabbing Fugate by the throat was an unjustified and excessive use of force.

62. It is well-established that a non-violent, non-resisting, or only passively-resisting suspect who is not under arrest has a right to be free from an officer's use of force.

63. Fugate continued to be non-violent and non-resistant after being forced back into a seated position.

64. Alternatively, Fugate continued to be non-violent and was passively resistant after being forced back into a seated position.

65. Williams' escalation to the use of physical restraint against Fugate was without justification and did not follow HPD's written use of force continuum.

66. Williams' escalation to the use of physical restraint against Fugate was objectively unreasonable.

67. Williams' escalation to the use of physical restraint against Fugate was an excessive use of force.

68.    Williams violated Fugate's well-established Fourth Amendment right to be free from

excessive force when Williams used excessive force that was objectively unreasonable on

Fugate prior to his arrest.

**Count II - 42 U.S.C. § 1983
Violation of Fourth Amendment (Excessive Use of Force):
(Claim by Fugate against Pigman)**

69.    It is well-established that a non-violent, non-resisting, or only passively resisting suspect

who is not under arrest has a right to be free from an officer's use of force.

70.    Fugate was not under arrest when Pigman drew his service taser and aimed it at Fugate's

face.

71.    Prior to Pigman drawing his service taser and aiming it at Fugate's face, Fugate had been

non-violent and non-resistant.

72.    Alternatively, prior to Pigman drawing his service taser and aiming it at Fugate's face,

Fugate had been non-violent and passively resistant.

73.    Pointing a taser at an individual and making a demand of that individual is an implicit

threat that if the individual does not comply with the demand, the person pointing the

taser will use it.

74.    Pigman's escalation to the use of his taser to threaten Fugate was without justification and

did not follow HPD's written use of force continuum.

75.    Pigman's escalation to the use of his taser to threaten Fugate was objectively

unreasonable.

76.    Pigman's escalation to the use of his taser to threaten Fugate was an excessive use of

force.

77. Pigman violated Fugate's well-established Fourth Amendment right to be free from excessive force when Pigman used excessive force that was objectively unreasonable on Fugate prior to his arrest.

78. Pigman violated Fugate's well-established Fourth Amendment right to be free from excessive force when Pigman used excessive force that was objectively unreasonable on Fugate to effect his arrest.

## Count III - 42 U.S.C. § 1983
### Violation of Fourth Amendment (Excessive Use of Force): (Claim by Sizemore against Williams)

79. At no point on March 30, 2024 was Sizemore detained or arrested.

80. At all times in her interaction with HPD on March 30, 2024 Sizemore was non-violent and non-resisting.

81. At no time on March 30, 2024 did Sizemore pose any immediate threat to William or any other person.

82. The only threat Sizemore posed to Williams, Pigman, or HPD prior to any physical contact with her was that she was recording his and officer Pigman's unlawful conduct.

83. It is well-established that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force.

84. It is well-established that a non-violent, non-resisting, or only passively resisting bystander who is not under arrest has a right to be free from an officer's use of force.

85. Williams physically took Sizemore's phone from her hand on March 30, 2024.

86. Williams admitted that he took Sizemore's phone from her hand on March 30, 2024.

87. Williams did not have Sizemore's consent to take her phone on March 30, 2024.

88. Williams took Sizemore's phone by force on March 30, 2024.

89. Williams's action of taking Sizemore's phone was a use of force.

90. Williams's use of force against Sizemore was objectively unreasonable.

91. Williams's use of force against Sizemore was unjustified.

92. Williams's use of force against Sizemore was excessive.

93. Williams violated Sizemore's Fourth Amendment right to be free from excessive force when he used excessive force to seize Sizemore's phone.

## Count IV – 42 U.S.C. § 1983
### *Monell* – (Excessive Use of Force):
### (Claims by Sizemore and Fugate against Hazard)

94. Hazard and the City of Hazard's officers, including, without limitation, the Mayor, City Manager, and the Chief of Police, have the power, authority, and responsibility to adopt and oversee policies, procedures, and practices for HPD.

95. Hazard has a duty to ensure that the policies, procedures, and practices of HPD are adequate and appropriate to reasonably protect the life, health, safety, and welfare of Hazard's citizens who interact with law enforcement in the course of carrying out their policing duties.

96. It was HPD's custom and practice to ignore its own written policies and procedures, and this custom and practice directly contributed to the use of excessive force against Sizemore and Fugate in violation of their constitutional rights.

97. It was Hazard's custom and practice to allow HPD to ignore its own written policies and procedures, because Hazard failed to adequately train, supervise, control and discipline the personnel under its supervision. Hazard's custom and practice of allowing HPD to

ignore its own written policies and procedures directly contributed to the use of excessive force against Sizemore and Fugate in violation of their constitutional rights.

98.    Despite the fact that HPD and Hazard had written policies that—if followed—would have prevented the unlawful conduct at issue in this case, it was the actual, factual custom of Hazard, HPD, and Williams to ignore those written policies instead.

99.    For example, one of HPD's written policies is that "It shall be the policy of the Hazard Police Department that all personnel are held responsible for knowing, understanding, and obeying all applicable provisions of this manual."

100.    However, when Williams—the Chief of Police—was asked while under oath whether he knew and understood all applicable provisions of the HPD manual, he answered "of course not."

101.    On December 3, 2024, Williams—while under oath—stated that he did not know whether anyone in HPD knew and understood all of the provisions of the HPD manual.

102.    While Chief of Police, Williams was so unfamiliar with HPD's Response to Resistance Policy that he could not describe anything about that policy without reading it.

103.    Pigman would not have been justified in tasing Fugate, let alone tasing him in the face. Pigman used excessive force when he threatened to tase Fugate, and when he pointed his taser at his face.

104.    Williams so willfully ignored HPD's policies that he did not even know whether Pigman would have been justified in tasing Fugate in the face. It is, in fact, HPD's written policy not to tase people in the face or to threaten force which would not be actually justified. Hazard's own Chief of Police did not even know this, and such ignorance was inexcusable under both the law and HPD's own written policy itself.

105.    Williams did not see a problem with the fact that he did not know whether HPD's taser policy including provisions about where HPD officers were supposed to tase subjects.

106.    It was Hazard's policies, practices, or customs (among other things, its custom of allowing its police officers to completely ignore HPD's written policies) that directly led to the violation of Fugate's and Sizemore's constitutional rights.

107.    The customs, policies, and practices of HPD were maintained and implemented by Hazard with deliberate indifference to Fugate's and Sizemore's constitutional rights.

**Count V – 42 U.S.C. § 1983**
***Monell* – (Unlawful Seizure):**
**(Claim by Sizemore against Hazard)**

108.    Hazard and the City of Hazard's officers, including, without limitation, the Mayor, City Manager, and the Chief of Police, have the power, authority, and responsibility to adopt and oversee policies, procedures, and practices for HPD.

109.    Hazard has a duty to ensure that the policies, procedures, and practices of HPD are adequate and appropriate to reasonably protect the life, health, safety, and welfare of Hazard's citizens who interact with law enforcement in the course of carrying out their policing duties.

110.    It was HPD's custom and practice to ignore its own written policies and procedures, and this custom and practice directly contributed to the unlawful seizure of Sizemore's phone in violation of her constitutional rights.

111.    It was Hazard's custom and practice to allow HPD to ignore its own written policies and procedures, because Hazard failed to adequately train, supervise, control and discipline the personnel under its supervision. Hazard's custom and practice of allowing HPD to

ignore its own written policies and procedures directly contributed to the unlawful seizure of Sizemore's phone in violation of her constitutional rights.

112.   Despite the fact that HPD and Hazard had written policies that—if followed—would have prevented the unlawful conduct at issue in this case, it was the actual, factual custom of Hazard, HPD, and Williams to ignore those written policies instead.

113.   In fact, Williams and Hazard were well-aware that the City of Hazard had previously been sued when an officer seized a phone out of a witness's hand, and that the City of Hazard had settled that case for $10,000.00.

114.   Despite the fact that Hazard had settled that other lawsuit for $10,000, based upon facts substantially similar to Sizemore's claim in this case, Hazard did not undertake to train Williams or its police officers to reasonably ensure that they did not violate the constitutional and other rights of other citizens in the community, such as Sizemore.

115.   It was Hazard's policies, practices, or customs (among other things, its custom of allowing its police officers to completely ignore HPD's written policies) that directly led to the violation of Sizemore's constitutional rights.

116.   The policies and practices of HPD were maintained and implemented by Hazard with deliberate indifference to Sizemore's constitutional rights.


**STATE LAW CLAIMS**

**Count VI – Common Law Battery**
**(Claim by Sizemore against Williams and Hazard)**

117.   Williams intentionally touched Sizemore, without Sizemore's consent, and without any legitimate reason to do so.

118.    Williams unlawfully touched Sizemore when he snatched her phone out of her hand while she was lawfully recording.

119.    Williams' unlawful touching of Sizemore constituted battery of Sizemore, for which Williams is liable.

120.    Williams acted intentionally when he snatched Sizemore's phone from her hand.

121.    Williams knew that his actions in snatching Sizemore's phone from her hand were unjustified and unlawful, and he did it anyway.

122.    Williams acted with malice toward Sizemore, and with reckless indifference to her rights, when he snatched her phone from her hand.

123.    Williams willfully and wantonly disregarded Sizemore's rights.

124.    Sizemore suffered damages as a result of Williams' unlawful conduct.

125.    Sizemore is entitled to recover her actual damages from Williams, and to recover punitive damages from Williams, in an amount sufficient to punish Williams for his unlawful conduct, and to deter Williams and others similarly situated from engaging in such conduct in the future.

126.    Hazard is vicariously liable for Williams' battery of Sizemore.


### Count VII – Negligence and Gross Negligence
### (Claim by Fugate against Williams, Pigman, and Hazard)

127.    Williams and Hazard owed Fugate a duty to ensure that HPD hired and retained reasonably competent individuals to serve as police officers for HPD.

128.    Williams and Hazard owed Fugate a duty to adequately train HPD's police officers to ensure that they were reasonably familiar with provisions of law that govern the

discharge of police officers' duties under the law, and HPD's own standard operating procedures.

129.  Williams and Hazard owed Fugate a duty to reasonably supervise the peace officers employed by HPD which were under their supervision and control, to ensure that those police officers acted—and were required to act—in the manner in which reasonably competent peace officers would act. Without limitation, this means that:

    a.    Hazard owed Fugate a duty to reasonably supervise both Williams and Pigman; and

    b.    Williams owed Fugate a duty to reasonably supervise Pigman.

130.  Williams breached his duty to Fugate by failing to ensure that HPD hired and retained reasonably competent individuals to serve as police officers of HPD.

131.  Williams breached his duty to Fugate by failing to require HPD's officers to be reasonably trained so that they could properly and lawfully carry out their duties as police officers.

132.  Williams breached his duty to Fugate by failing to supervise Pigman to ensure that Pigman's actions were in accordance with applicable law and HPD's own standard operating procedures.

133.  Hazard breached its duty to Fugate by failing to ensure that HPD hired and retained reasonably competent individuals to serve as police officers of HPD.

134.  Hazard breached its duty to Fugate by failing to ensure that its Chief of Police was reasonably competent to serve in that capacity.

135.   Hazard breached its duty to Fugate by failing to require HPD's peace officers to be reasonably trained so that they could properly and lawfully carry out their duties as peace officers.

136.   Hazard breached its duty to Fugate by failing to supervise Williams and Pigman to ensure that their actions were in accordance with applicable law and HPD's own standard operating procedures.

137.   Williams and Pigman both violated KRS 431.025 in arresting Fugate when they used unnecessary force or violence in making the arrest.

138.   The actions of Williams and Pigman were negligent per se, pursuant to (without limitation) KRS 431.025.

139.   Fugate suffered damages as a result of the negligence of Williams, Pigman, and Hazard, in the form of physical injury and discomfort, emotional distress, and humiliation.

140.   Williams and Pigman both acted with malice toward Fugate, with reckless indifference to his rights.

141.   Williams and Pigman both willfully and wantonly disregarded Fugate's rights.

142.   Williams and Pigman are both liable to Fugate for the damages he sustained as a result of their negligent conduct.

143.   Hazard is vicariously liable to Fugate for the negligent actions of Williams and Pigman.

144.   Hazard is directly liable to Fugate for its own negligent hiring, training, and supervision of the peace officers in its employ, including (without limitation) Williams and Pigman.

### Count VIII – Negligence and Gross Negligence
### (Claim by Sizemore against Hazard and Williams)

145.  Hazard owed Sizemore a duty to ensure that HPD hired and retained a reasonably

competent individuals to serve as its Chief of Police.

146.  Hazard owed Sizemore a duty to adequately train its Chief of Police, or to provide such

training as would ensure that he was reasonably familiar with provisions of law that

governs the discharge of police officers' duties under the law, and HPD's own standard

operating procedures.

147.  Hazard owed Sizemore a duty to reasonably supervise its Chief of Police, Williams, who

was under Hazard's supervision and control, to ensure that Williams acted—and was

required to act—in the manner in which reasonably competent Chief of Police would act.

148.  Hazard breached its duty to Sizemore by failing to ensure that its Chief of Police was

reasonably competent to serve in that capacity.

149.  Hazard breached its duty to Sizemore by failing to require Williams to be reasonably

trained so that he could properly and lawfully carry out his duties as Chief of Police, and

by failing to supervise Williams to ensure that his actions were in accordance with

applicable law and HPD's own standard operating procedures.

150.  Williams violated KRS 431.025 in arresting Fugate when he used unnecessary force or

violence in making the arrest, some of which unnecessary force or violence was directed

at Sizemore.

151.  The actions of Williams were negligent per se, pursuant to (without limitation) KRS

431.025.

152.  Sizemore suffered damages as a result of the negligence of Hazard, in the form of

emotional distress.

153.   Williams acted with malice toward Sizemore, with reckless indifference to her rights.

154.   Williams willfully and wantonly disregarded Sizemore's rights.

155.   Williams is liable to Sizemore for the damages she sustained as a result of Williams'

negligent conduct.

156.   Hazard is vicariously liable to Sizemore for the negligent actions of Williams.

157.   Hazard is directly liable to Sizemore for its own negligent hiring, training, and

supervision of Williams.


**WHEREFORE**, Plaintiff respectfully demands the following:

1.   Judgment against Defendants and in favor of Plaintiffs in an amount to be determined at

trial, in excess of the jurisdictional limits of this Court, and sufficient to compensate

Plaintiffs for the following elements of damages:

    a.   Mental and physical pain and suffering;

    b.   Punitive damages in proportion to the willful and grossly negligent conduct of the

        Defendants allowed pursuant to 42 U.S.C. § 1983;

    c.   Punitive damages for the Plaintiffs' tort claims under Kentucky law;

2.   All additional expenses incurred by Plaintiffs, including but not limited to, travel

expenses, necessitated by Defendants' negligent acts;

3.   Pre-judgment and post-judgment interest on all amounts awarded herein;

4.   For the Plaintiffs' costs and expenses incurred herein, including reasonable attorneys' fees

pursuant to 42 U.S.C. § 1983;

5.   Trial by Jury on all issues so triable; and

6.   Any and all other relief to which Plaintiffs may appear entitled.

Respectfully submitted,


/s/Joshua S. Harp
Joshua S. Harp (KY Bar No. 91386)
Rex Kilburn (KY Bar No. 100195)
Baughman Harp, PLLC
401 West Main Street, Suite 1
Frankfort, KY 40601
P.  502-227-2271
F.  502-352-2936
E.  harp@harplawoffice.com
*Counsel for Plaintiff*